## 2009 ND 104

**In the Matter of A.M.**

**Cynthia M. Feland, Assistant Burleigh County State's Attorney, Petitioner and Appellee**

v.

**A.M., Respondent and Appellant.**

**No. 20080204.**

Supreme Court of North Dakota.

June 17, 2009.

Julie Ann Lawyer, Assistant State's Attorney, Bismarck, for petitioner and appellee.

Susan R. Schmidt, Susan Schmidt Law Office, Bismarck, for respondent and appellant.

SANDSTROM, Justice.

[¶ 1]  A.M. appeals a district court order denying his petition for discharge from commitment as a sexually dangerous individual.  Because the State proved by clear and convincing evidence that A.M. remains a sexually dangerous individual, we conclude the district court did not clearly err in denying A.M.'s petition.  We affirm.

I

[¶ 2]  In 1999, A.M. was found to be a sexually dangerous individual and was civilly committed to the North Dakota State Hospital for treatment.  At the time, A.M.'s diagnoses included pedophilia, sexually attracted to both sexes, nonexclusive type; fetishism; and antisocial personality disorder.  Initial sexually dangerous individual evaluations had determined A.M. was at high risk for sexual and/or violent recidivism.  A.M.'s probability of recidivist sexually predatory conduct had also been estimated through actuarial risk assessment instruments and the Psychopathy Checklist–Revised (PCL–R).  A.M. continually waived his right to an annual discharge hearing until 2007.  In August 2007, A.M. requested a discharge hearing under N.D.C.C. § 25–03.3–18.

[¶ 3]  On June 17, 2008, the district court held a discharge hearing.  The court heard testimony from two licensed psychologists: Dr. Lynn Sullivan from the North Dakota State Hospital, who had conducted sexually dangerous individual annual re-evaluations of A.M., and Dr. Robert G. Riedel, whom the court appointed as A.M.'s independent expert evaluator.  The two experts disagreed on whether A.M. remained a sexually dangerous individual.

[¶ 4]  Dr. Sullivan testified that she reviewed A.M.'s charts in preparing her annual report filed with the court in Sep-

tember 2007 and in preparation for her testimony. Dr. Sullivan testified she had previously interviewed A.M. in July 2006 in preparing a prior annual review, but only met briefly with A.M. in September 2007, at which time A.M. declined to be interviewed. In her report and testimony, Dr. Sullivan concluded that A.M. remained a sexually dangerous individual and should remain committed for treatment.

[¶ 5] Dr. Riedel testified he reviewed A.M.'s extensive medical and psychological charts, interviewed A.M., and administered a set of psychometric tests. Dr. Riedel testified that he administered the Kaufman Test of Educational Achievement, the Woodcock–Johnson Test of Cognitive Abilities, the Personality Assessment Inventory for Adults, and the Clark Sexual History Questionnaire, in addition to the PCL–R2nd, the MnSOST–R, the RRASOR, and the Static–99. On the basis of the actuarial tests, his review of the file, and his clinical judgment, Dr. Riedel opined that A.M. is at a moderate risk of re-offending and that he has more concerns about A.M.'s lack of independent living skills than of A.M.'s sexually re-offending.

[¶ 6] Following the June 2008 hearing, after considering the testimony of the two experts and the record, the district court found the State had shown by clear and convincing evidence that A.M. continues to be a sexually dangerous individual as defined in N.D.C.C. ch. 25–03.3 and denied A.M.'s petition for discharge.

[¶ 7] The district court had jurisdiction of the discharge hearing under N.D. Const. art. VI, § 8, and N.D.C.C. § 25–03.3–02. The appeal from the order was timely under N.D.C.C. § 25–03.3–19. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 25–03.3–19.

II

[¶ 8] This Court applies a modified clearly erroneous standard of review and will affirm a district court order denying a petition for discharge from commitment as a sexually dangerous individual "unless it is induced by an erroneous view of the law or we are firmly convinced it is not supported by clear and convincing evidence." *Matter of G.R.H.*, 2008 ND 222, ¶ 7, 758 N.W.2d 719; *Matter of E.W.F.*, 2008 ND 130, ¶ 8, 751 N.W.2d 686. Section 25–03.3–18(4), N.D.C.C., places the burden of proof on the State to prove by "clear and convincing evidence that the committed individual remains a sexually dangerous individual." "Sexually dangerous individual" is defined as:

[A]n individual who is shown to have [1] engaged in sexually predatory conduct and who [2] has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that [3] makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. It is a rebuttable presumption that sexually predatory conduct creates a danger to the physical or mental health or safety of the victim of the conduct. For these purposes, mental retardation is not a sexual disorder, personality disorder, or other mental disorder or dysfunction.

N.D.C.C. § 25–03.3–01(8). The phrase "likely to engage in further acts of sexually predatory conduct" means the individual's "propensity towards sexual violence is of such a degree as to pose a threat to others." *Interest of M.B.K.*, 2002 ND 25, ¶ 18, 639 N.W.2d 473. "This definition prevents a contest over percentage points and the results of other actuarial tools, and allows experts to use the fullness of their

education, experience and resources available to them in order to determine if an individual poses a threat to society." *Id.*

[¶ 9] Additionally, consistent with the United States Supreme Court's opinion in *Kansas v. Crane,* 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), we construe the definition of a "sexually dangerous individual" to require a "nexus between the disorder and dangerousness, proof of which encompasses evidence showing the individual has serious difficulty in controlling his behavior, which suffices to distinguish a sexually dangerous individual from other dangerous persons." *Matter of G.R.H.,* 2008 ND 222, ¶ 7, 758 N.W.2d 719; *see also Matter of E.W.F.,* 2008 ND 130, ¶ 10, 751 N.W.2d 686.

[¶ 10] All sexually predatory conduct may be considered in an analysis under N.D.C.C. § 25–03.3–01(8), including conduct not resulting in a charge or conviction. *G.R.H.,* at ¶ 7; *Interest of P.F.,* 2006 ND 82, ¶ 20, 712 N.W.2d 610. We have said the district court is the best credibility evaluator in cases of conflicting testimony, and we will not second-guess the district court's credibility determinations. *Matter of Hehn,* 2008 ND 36, ¶ 23, 745 N.W.2d 631.

### III

[¶ 11] On appeal, A.M. argues the district court erred in finding clear and convincing evidence that A.M. remains a sexually dangerous individual. A.M. requests that the court's order be vacated and that he be released from the state hospital. A.M. challenges the sufficiency of the evidence, asserting the State did not prove by clear and convincing evidence that A.M.'s propensity towards sexual violence poses a threat to others and that A.M. would have serious difficulty controlling his behavior.

[¶ 12] A.M. argues his case is unusual because he committed his sexual offenses as a juvenile and was committed to the state hospital directly after he was released from the juvenile system. A.M. asserts that when he was a juvenile, there were no risk assessment tests for use on juveniles, and that the tests presently available for adult offenders are not designed for use on individuals who committed offenses as a juvenile. However, we have explained:

> "The fact that ... actuarial test scores [do] not give rise to scores showing a high risk of re-offending does not preclude the fact-finder from coming to an alternative conclusion." *Matter of Hehn,* 2008 ND 36, ¶ 21, 745 N.W.2d 631. That the actuarial tests do not indicate an individual is "statistically likely to re-offend is of little consequence," because the ultimate decision to determine whether there is clear and convincing evidence sufficient for commitment rests with the district court. *Id.*

*Matter of M.D.,* 2008 ND 208, ¶ 10, 757 N.W.2d 559.

[¶ 13] A.M. relies on Dr. Riedel's report and testimony, contending that A.M. did not meet the criteria for finding A.M. was "likely to engage in further acts of sexually predatory conduct," and A.M. asserts there was no evidence presented specifically showing that A.M. would have serious difficulty controlling his behavior. A.M. argues his risk level is "difficult to determine," not only because there are no actuarial tests, but also because his offenses occurred when he was a juvenile and his diagnoses have changed. A.M. focuses on the differences in the experts' evaluations, essentially arguing the greater weight of Dr. Riedel's evaluation and various alleged problems with his treatment at the state hospital.

[¶ 14] The State relies largely on the expert opinion of Dr. Sullivan, who testified A.M.'s use of sex or violent sexual fantasies to deal with anger, depression, or frustration was a "dynamic risk factor for future sexual offending." Dr. Sullivan testified she did not observe any significant progress in A.M.'s treatment during the previous year. Dr. Sullivan's report says that there is ongoing evidence of the presence of paraphilia and that A.M. makes little to no effort to change this pattern of behavior. The State acknowledges Dr. Riedel's opinion that on the basis of risk assessment testing, A.M. still presents a "moderate" risk of re-offending, but argues the district court may still find clear and convincing evidence supporting civil commitment and is the ultimate decision-maker whether an individual is a sexually dangerous person.

[¶ 15] In its memorandum opinion and order, the district court considered and discussed the testimony of both Drs. Sullivan and Riedel. Dr. Sullivan testified A.M. no longer appeared committed to his treatment and continued to have a sexual obsession with a female staff member. Dr. Sullivan observed that A.M. had been doing well at the state hospital, having progressed to stage three of his treatment, but in the past few years A.M. had been demoted to stage one of treatment, put forth no effort in treatment sessions, and made no significant progress in his treatment during 2007.

[¶ 16] The district court also noted Dr. Sullivan testified that while A.M. continued to have the diagnosis of pedophilia, she also testified the pedophilia diagnosis may no longer be present but that A.M. still has the diagnoses of fetishism and antisocial personality disorder. Dr. Sullivan, however, also testified A.M. continues to meet criteria for an additional diagnosis of "paraphilia not otherwise specified (non-

consent)," which Dr. Sullivan testified is basically interest in sexual behavior with a non-consenting person. Dr. Riedel testified he was not opposed to this diagnosis by Dr. Sullivan.

[¶ 17] Dr. Sullivan testified that, given A.M.'s sexual disorder or other mental disorder or dysfunction, A.M. is an individual likely to engage in further acts of sexually predatory conduct constituting a danger to the physical or mental health or safety of others. The district court noted that in Dr. Sullivan's opinion, A.M. is at "high risk for sexual and/or violent [recidivism]." Dr. Sullivan also specifically testified that A.M. continues to have difficulty controlling his behavior and stated that "even in a controlled setting [A.M.] has continued to engage in fantasies that are violent and does not appear to be implementing any interventions to stop those."

[¶ 18] The district court found Dr. Riedel's reports and testimony demonstrated he had put in considerable time and effort examining A.M. In Dr. Riedel's opinion, A.M. has a diagnosis of pedophilia, nonexclusive by history, but weak current support. Dr. Riedel acknowledged that A.M. has a diagnosis of fetishism and partialism, and a substance abuse dependency, as well as antisocial personality disorder. Dr. Riedel expressed concern over A.M.'s lack of a support group and his long-term institutionalization, in addition to expressing concerns over the treatment program at the state hospital. The court found that both Drs. Sullivan and Riedel agreed A.M.'s "history and diagnosis demonstrate [A.M.] is a sexually dangerous individual who has been shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder or other mental disorder or dysfunction."

[¶ 19] The district court further stated:

If the Court understood Dr. Riedel's testimony correctly, he agrees that there is evidence that [A.M.'s] sexual disorder or other mental disorder or dysfunction makes him an individual likely to reoffend by engaging in further acts of a sexual nature, which would be dangerous and perhaps violent conduct which constitute a danger to the physical or mental health or safety of others. However, he had concerns about whether [A.M.'s] score on the statistical tests would show that he was at any greater risk to reoffend in a sexually predatory manner than the average prison population.

The court however concluded, "In the absence of reliable statistical data, Dr. Riedel acknowledges that clinical information and behavioral material from [A.M.'s] treatment are also valuable tools to assess the likelihood to reoffend in a sexually predatory manner."

[¶ 20] Here, considering conflicting experts' reports and opinions, there is evidence that A.M. no longer appeared committed to his treatment and, in fact, had regressed in his treatment at the state hospital. *See Matter of M.D.*, 2008 ND 208, ¶ 11, 757 N.W.2d 559 (discussing *Matter of Barrera*, 2008 ND 25, ¶ 13, 744 N.W.2d 744 (concluding committed sex offender's failure to complete sex offender treatment and alcohol treatment program increased offender's overall risk levels)). There is evidence A.M. inappropriately touched a female staff member at the hospital, is obsessed with the female staff member, and has current recurring deviant fantasies of forcing a female to have sex with him. There is also evidence A.M. has discussed that in dealing with his anger, his fantasies are sometimes violent towards females. As Dr. Sullivan testified, this is "a very big red flag" because "using sex or fantasies about sex to deal with emotions such as anger or depression or frustration" is a dynamic risk factor for future sexual offending. Furthermore, Dr. Sullivan testified that even in a controlled setting, A.M. continues to have difficulty controlling his behavior. We will not second-guess the district court's credibility determinations. *See Matter of Hehn*, 2008 ND 36, ¶ 23, 745 N.W.2d 631.

[¶ 21] We conclude from our review of the record that the district court's order denying A.M.'s petition for discharge from commitment was not induced by an erroneous view of the law and is supported by clear and convincing evidence that A.M. remains a sexually dangerous individual. We therefore conclude the district court did not clearly err in denying A.M.'s petition.

IV

[¶ 22] We affirm the district court order denying A.M.'s petition for discharge from his commitment as a sexually dangerous individual.

[¶ 23] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.